No. 68,307

STATE OF KANSAS, *Appellee,* v. DONALD RICHARD BORTHWICK, *Appellant.*

(880 P.2d 1261)

Opinion filed September 16, 1994.

*Robert E. Keeshan,* of Hamilton, Peterson, Tipton & Keeshan, of Topeka, argued the cause and was on the briefs for appellant.

*Ellen H. Mitchell,* assistant county attorney, argued the cause, and *Thomas R. Stanton,* assistant district attorney, *Julie McKenna,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, Donald Borthwick, appeals his conviction of one count of rape, in violation of K.S.A. 21-3502(1)(a). The Court of Appeals affirmed his conviction in an unpublished opinion filed December 17, 1993. We granted the defendant's petition for review on four issues: (1) Was there sufficient evidence that the victim was overcome by force or fear to sustain the conviction? (2) Did the trial court err by not instructing the jury on attempted rape? (3) Did the trial court err in allowing the State to present certain rebuttal testimony? (4) Did the trial court erroneously permit prosecutorial misconduct during closing argument? Finding no reversible error, we affirm.

The victim, J. C., had been a student in the defendant's wife's learning disabilities classroom. J. C. has spastic hemiplegia cerebral palsy and lives with her mother. J. C. is four-feet, nine or ten inches tall and weighs about 88 pounds. She cannot walk without assistance; she cannot stand without support. At home, she moves about the house by crawling. J. C. was, at the time, 21 years old.

After J. C. graduated from high school she and Mrs. Borthwick remained friends. They occasionally would go out to dinner or for ice cream together. The defendant usually accompanied them on these outings because Mrs. Borthwick needed help getting J. C. in and out of the car. At the time charges were filed, the defendant was 71 years old.

On August 12, 1991, J. C. called the defendant's home because she and Mrs. Borthwick had made tentative plans to go out to dinner together. When the defendant told her that Mrs. Borthwick was at a meeting and would be unable to go out to dinner, J. C. invited the defendant over to watch movies. He agreed and brought some ice cream with him.

After the defendant arrived at J. C.'s home, he sat on the floor behind her. He rubbed her back, lifted her shirt and bra, and started "chewing" on her breast. She asked him to stop but he did not. He also nibbled on her ear. She asked him to stop but he did not. The defendant then laid J. C. down on the floor on her back, lifted her legs, pulled down her shorts and underpants, and put his fingers in her vagina. As J. C. testified at trial about the penetration, the prosecuting attorney asked J. C. if she had asked the defendant to stop. J. C. replied: "I asked him to think about it and to think about his wife and to think about what he was doing and then I asked him to stop." She also testified that she tried to keep her legs together, "but they always come apart." J. C. testified that she was afraid and felt powerless to stop what was happening.

After the defendant stopped, he went into the bathroom to wash his hands. J. C. testified that they then ate ice cream together. J. C. testified that while they were in the kitchen she tried to use the phone to call her mother, but the defendant took it out of her hand and told her that was "not a good idea. Let's not tell your mom." When J. C. asked why she could not tell her mother, the defendant replied: " 'Cause if your mom finds out that I was here, then your mom would have a lot of questions and I don't want to run into your mom or anybody else." Before the defendant left, he told J. C.: "You better not say anything 'cause I'll get in trouble with my wife." He also asked J. C. not to report him and to make sure that nobody knew he was there. He took his ice cream with him when he left so that J. C.'s mother would not know that anyone had been at the house while she was gone.

J. C. testified that she did not give the defendant permission to do any of the things he did to her and that she was afraid of him while he did these things. At trial, the defendant denied that he touched J. C., other than to give her a hug when he first arrived.

### Sufficiency of the evidence

The defendant refers the court to J. C.'s testimony on cross-examination to support his claim that, even if her testimony is

believed, there was not sufficient evidence to support the jury's verdict. In response to defense counsel's questions, J. C. testified that as the defendant was putting his fingers in her vagina she did not tell him to stop but only told him to "think about it." She testified that the defendant did not force her in any fashion and that he did not threaten her. She also testified that she did not give him any indication, verbal or otherwise, that she was afraid, other than her attempts to keep her legs together.

The defendant also notes that J. C. did not report the incident to anyone until several days later when she told her mother what had happened. He also contends that J. C.'s physician's testimony supports his claim that the evidence was insufficient to support his conviction. Dr. Bossmeyer examined J. C. nine days after the incident. He found no bruising or lacerations on J. C.'s external genitalia and no physical indications of force or struggle. He testified that J. C.'s hymen was intact.

K.S.A. 21-3502 defines rape:

"(1) Rape is sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances:

(a) When the victim is overcome by force or fear;

(b) when the victim is unconscious or physically powerless;

(c) when the victim is incapable of giving consent because of mental deficiency or disease, which condition was known by the offender or was reasonably apparent to the offender; or

(d) when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance administered to the victim by the offender, or by another person with the offender's knowledge, unless the victim voluntarily consumes or allows the administration of such substance with knowledge of its nature."

K.S.A. 21-3501(1) defines "sexual intercourse" for purposes of rape to include:

"any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however, slight, is sufficient to constitute sexual intercourse. 'Sexual intercourse' does not include penetration of the female sex organ by a finger or object in the course of the performance of:

(a) Generally recognized health care practices; or

(b) a body cavity search conducted in accordance with K.S.A. 22-2520 through 22-2524, and amendments thereto."

The defendant was charged and convicted by jury trial under 21-3502(1)(a); that is, the jury concluded that J. C. was overcome by force or fear. In a 2-1 decision by the Court of Appeals affirming the conviction, Judge M. Kay Royse dissented, concluding as a matter of law that the evidence was insufficient to establish that J. C. was overcome by force or fear.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McDonald*, 250 Kan. 73, Syl. ¶ 7, 824 P.2d 941 (1992).

Accord *State v. Harkness*, 252 Kan. 510, Syl. ¶ 10, 847 P.2d 1191 (1992).

Although Dr. Bossmeyer testified that he found no physical evidence of rape, we must view his testimony in context and in the light most favorable to the prosecution. Dr. Bossmeyer examined J. C. nine days after the assault; in all of the rape examinations he had conducted he found bruising in only one. He testified that the presence of lacerations depends on the size of the object used to penetrate the vagina. In this case, the defendant was charged with digital penetration. Finally, he testified that some women can have intercourse with no trauma to the hymen. Dr. Bossmeyer's testimony is not conclusive.

The State called Dr. Lassiter as its witness. He testified that in the rape examinations he conducted he rarely saw bruising or lacerations unless the assault was particularly violent or perpetrated by multiple offenders. In light of the medical testimony and the nature of the assault, the lack of physical evidence is not determinative.

More importantly, we have held that the "testimony of the prosecutrix alone can be sufficient to sustain a rape conviction without further corroboration as long as the evidence is clear and convincing and is not so incredible and improbable as to defy belief." *State v. Cooper*, 252 Kan. 340, 347, 845 P.2d 631 (1993). This basic principle must be viewed in the light of another important principle: "The function of weighing the evidence and passing on credibility belongs to the jury, not to us. A verdict

secured on substantial competent evidence will not be disturbed on appellate review. [Citation omitted.]" *Cooper*, 252 Kan. at 347. Thus, we afford considerable deference to the jury with respect to witness credibility and weight of the evidence. If the jury believes an alleged rape victim's uncorroborated testimony and that evidence is sufficient to sustain the conviction, we will find that testimony sufficient to support a conviction unless it is "so incredible and improbable as to defy belief."

The defendant argues that this case is controlled by *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983), the only recent case in which we overturned a rape conviction because the evidence was insufficient as a matter of law to sustain the jury verdict. In *Matlock*, we concluded that the "uncontradicted facts cast so much doubt upon the credibility of the prosecutrix that no rational factfinder could have believed her testimony and found the defendant guilty beyond a reasonable doubt." 233 Kan. at 5-6. The prosecutrix in *Matlock* claimed that her stepfather raped her in her bedroom while several other people were present in the house.

The defendant claims that the court looked to five factors in reversing the jury verdict in *Matlock*. He claims this case is comparable to *Matlock* on four of those five factors, thus requiring reversal. In fact, we looked to 14 factors, not 5, that completely undermined the complainant's credibility in *Matlock*. 233 Kan. at 4-5. The 5 factors appellant discusses comprise only 1 of those 14. That one factor is corroborative evidence, which is not necessary unless the victim's testimony is so incredible as to defy belief. *Cooper*, 252 Kan. at 347.

In *Matlock*, we noted the following uncontroverted facts that cast doubt on the complainant's credibility: (1) The alleged rape occurred on an old creaky bed in a room between the victim's two sisters' bedrooms; (2) the bed was close enough to the wall that it would bang on the wall whenever someone moved around on it, but no one heard the assault; (3) the complainant did not cry out; (4) she did not clean herself after the attack; (5) she wore the same underwear the next day; (6) she testified that she cried for three hours afterwards, but no one in the house heard her;

(7) she later denied having had sexual relations with anyone; (8) she told no one until 15 months later; (9) she continued to demonstrate friendly feelings toward the assailant (her stepfather), including choosing to move to Tulsa with the family when she could have stayed in Leavenworth; (10) she outwardly showed affection "[h]ugging, talking to him friendly as ever"; (11) she accompanied him alone on long trips after the alleged rape; (12) she admitted that she wanted to remain the decision maker as she was while her stepfather was in prison and had threatened to send him back to prison; (13) she admitted "that lying had been a part of her life for a long time"; and (14) the corroborative factors usually found in rape cases were not present: (a) no outcry, (b) no sign of a struggle, (c) no complaint at the earliest opportunity, (d) no reasonable opportunity to commit forcible rape (others in house, noisy bed, etc.) and (e) no evidence of sperm on her body, clothing, or bed, and no physical examination. 233 Kan. at 4-5. The court also noted there was no evidence, other than the complainant's testimony, that was inconsistent with the defendant's innocence. 233 Kan. at 5.

Unlike the circumstances in *Matlock*, J. C. and the defendant were alone in the house, so there were no other witnesses who could have seen or heard any of the events or J. C.'s behavior immediately afterward. Although J. C. did not report the incident immediately, she did tell her mother about it within five days and then reported it to the police with the aid of her family. There was no evidence that J. C. remained friendly with the defendant or his wife after the incident. Unlike the victim in *Matlock*, there was no evidence that J. C. had ever threatened the defendant or that she had any motive to fabricate her story. There was no evidence that J. C. had a tendency to tell lies.

Four of the five factors we considered in *Matlock* with respect to corroborative evidence often found in rape cases were not present in the case at bar: No outcry, no sign of a struggle, no complaint at the earliest opportunity, no evidence of sperm on the body, and no (prompt) physical examination. There was, however, ample opportunity to commit the crime because the defendant and J. C. were alone in the home.

The existence of five corroborative factors, however, is not controlling in the present case. First, corroborative evidence is not necessary to sustain a rape conviction as long as the evidence is clear and convincing and is not so incredible and improbable as to defy belief. *Cooper*, 252 Kan. at 347. In *Matlock*, numerous uncontested facts made the complainant's testimony unbelievable. Such is not the case here. A jury reasonably could believe J. C.'s testimony. She had no motive to lie and no history of untruthfulness. J. C. was alone with the defendant; thus, an outcry likely would not have helped her because no one else was in the house to hear her. No sperm was detected in the present case because the defendant did not penetrate J. C.'s vagina with his penis or even remove his clothes. Although J. C. did not report the incident at the earliest opportunity, she did report it within 5 days, in contrast to the 15-month delay in *Matlock*. Some delay is understandable, for the defendant was married to one of J. C.'s good friends and disclosure of the events could hurt Mrs. Borthwick and ruin that friendship. Given the disparity in physical size and ability between J. C. and the defendant, it is not unreasonable that there was no physical evidence of a struggle. *Matlock* does not require reversal here.

We find *State v. Hammon*, 245 Kan. 450, 781 P.2d 1063 (1989), to be more comparable to the instant case than is *Matlock*. In *Hammon*, the victim (F. M.) was 71 years old. Hammon drove a bus that provided transportation services for people with disabilities, and F. M. rode that bus daily. F. M. claimed that Hammon raped her on two separate occasions. Like J. C., F. M. was alone in the house with her assailant during the rapes. Hammon argued there was insufficient evidence to support his conviction because there was no physical evidence of the rape and no immediate complaint. In *Hammon*, like the present case, the court was not faced with uncontradicted facts that cast doubt on the complainant's credibility as in *Matlock*. We affirmed Hammon's conviction.

The absence of corroborating evidence or the presence of conflicting evidence does not by itself render a complainant's testimony "so incredible as to defy belief." Even in the face of evi-

dence seemingly contradicting a rape victim's testimony, this court has held her testimony sufficient to support a conviction. In *State v. Sanders*, 227 Kan. 892, 610 P.2d 633 (1980), the victim testified she had been beaten, yet she had no bruises the following day. The court found that her testimony was "inconsistent in many ways with that of other witnesses." 227 Kan. at 895-96. The court concluded, however:

"[T]he crucial issue—whether the act was accomplished by mutual consent or against the victim's will by force and fear—had to be determined by the jury on the basis of the testimony of the prosecutrix and the defendant. The jury found her testimony believable and rejected defendant's version. The function of this court is not to weigh the evidence, but to determine whether upon the evidence introduced a rational factfinder could have found guilt beyond a reasonable doubt. We conclude that the evidence was sufficient." 227 Kan. at 896.

Similarly, in *Cooper*, the victim testified about an assault in which she was beaten, knocked unconscious, and raped vaginally and anally. Although there was corroborative evidence in the form of bruises, cuts, and scratches, the medical examination revealed no physical sign of injury to the vagina or rectum, and the rape kit tests revealed no sperm or seminal material. We found the evidence sufficient to sustain the conviction.

There are no facts of record here that would render J. C.'s testimony "so incredible as to defy belief." The key question is whether J. C.'s testimony, if believed, is sufficient to support a rape conviction. Judge Royse noted in her dissent that although J. C. told the defendant to stop, "nothing in the record permits an inference that this statement was made in connection with the acts which give rise to this conviction." We disagree and find that J. C.'s testimony on direct does permit such an inference. In the context of her testimony about the defendant placing his fingers in her vagina, the State's attorney asked J. C. if she asked the defendant to stop. J. C. testified: "I asked him to think about it and to think about his wife and to think about what he was doing and then I asked him to stop." There is evidence from which the jury could find that J. C. asked the defendant to stop at the time he placed his fingers in her vagina.

Viewing the record as a whole, however, we also note that J. C.'s testimony on that particular issue was not consistent. Even

if we were to find, as Judge Royse did, that the record did not support a finding that J. C. asked the defendant to stop putting his fingers in her vagina, such a finding would not require reversal. The record as a whole supports a conclusion that J. C. conveyed to the defendant that his advances were not welcome. She was alone in a house with a man who was married to one of her good friends. When he touched J. C.'s breast, she told him to stop and he did not. When he nibbled on her ear, she told him to stop and he did not. She testified on direct that when he laid her down, took off her pants, and began to touch her genitalia, she told him to stop. On cross-examination, she testified that she tried to get him to stop by keeping her legs together and telling the defendant to think about his wife and to think about what he was doing. Even though her testimony was inconsistent in some respects, J. C. told the defendant in various ways that she did not desire his conduct to continue. Viewing the record in the light most favorable to the prosecution, we find that a rational factfinder reasonably could conclude that the act was not accomplished with mutual consent.

The defendant next contends that even if J. C.'s testimony is believed, there was not sufficient evidence that J. C. was overcome by force or fear. In support of his contention, the defendant cites several cases in which this court has found sufficient force or fear existed and contends that because such conditions do not exist in the present case, J. C. was not overcome by force or fear. *Cooper*, 252 Kan. 340 (physical evidence of a struggle); *State v. Lile*, 237 Kan. 210, 699 P.2d 456 (1985) (the defendant threatened the victim with a gun); *State v. Cantrell*, 234 Kan. 426, 673 P.2d 1147 (1983) (the victim physically struggled with the defendant, cried, and begged); *Sanders*, 227 Kan. at 895 (the defendant struck the victim repeatedly, twisted her arm, forced her into the bedroom, and threatened to beat and kill her); *State v. Hampton*, 215 Kan. 907, 908, 529 P.2d 127 (1974) (the defendant threw the victim to the floor, choked her, and held a sharp object to her throat); *State v. Lora*, 213 Kan. 184, 186, 515 P.2d 1086 (1973) (the defendant threw the victim to the ground, stomped and kicked her, and tied her up). The defendant's argument is

not persuasive. This court's conclusion that the evidence of force or fear was sufficient in the above-cited cases does not mean that a rape victim must endure such violence to sustain a finding that she was overcome by force or fear.

Other recent cases make clear that such violent assaults and life-threatening actions are not necessary to sustain a "force or fear" rape conviction. In *Hammon*, 245 Kan. 450, F. M. rode the bus daily with the defendant and had befriended him. In May, F. M. let the defendant come to her house to use the bathroom. "She testified that when he came out of the bathroom, he grabbed her, forced her into the bedroom, tore off her clothing, and threw her on the bed in spite of her protestations." 245 Kan. at 451. He undressed from the waist down and penetrated her vagina. The victim told no one of the incident and continued to ride the bus. Witnesses testified that F. M. continued to sit near the defendant and talk to him with no apparent fear. In July, he again asked to use her bathroom and F. M. agreed. When he came out of the bathroom, he forced her to touch his penis while he reached his hand down her jeans and put his fingers in her vagina. After he left, she told a family friend what had happened, and he urged her to report it to the police.

On appeal, this court rejected Hammon's contention that the evidence was insufficient to support his rape conviction under K.S.A. 21-3502(1)(a): "The argument of insufficient force is without merit—F. M. testified that Hammon forced himself on her without her consent during both incidents. This is sufficient to prove the elements of rape." 245 Kan. at 456.

In *Cantrell*, 234 Kan. 426, the victim and the defendant were acquainted, and the rape occurred in an automobile:

"Mrs. B. testified that she resisted and struggled with the defendant; that she was crying; and that she begged the defendant to stop although she admitted that he made no threats, did not strike her, had no weapon and did not curse her or raise his voice. Her clothes were not ripped or torn and she suffered no bruises or other evidence of trauma. She made no attempt to scream, honk the horn or leave the vehicle." 234 Kan. at 428.

We found the evidence sufficient that she was overcome by force or fear:

"While the evidence in this case is not strong on the element of overcoming the resistance of the victim, we have concluded that the testimony of Mrs. B. was sufficient to meet the test set forth in *Matlock*. Her testimony that she physically resisted the defendant is clear and the jury could have concluded from her actions that her resistance was also overcome by fear. See *State v. Hacker*, 197 Kan. 712, 421 P.2d 40 (1966), *cert. denied* 386 U.S. 967 (1967). The jury had the opportunity to view the witnesses and to hear the evidence and evidently believed the testimony of Mrs. B. rather than that of the defendant." 234 Kan. at 429.

The legislature did not intend to require victims to endure the kind of additional degree of physical violence described in the cases on which the defendant relies in order to support a rape conviction. The legislature required only that a victim be overcome by force or fear; she need not endure a beating or be threatened with a deadly weapon in order to satisfy that requirement.

In order to determine whether a rational factfinder could have found beyond a reasonable doubt that a victim of rape has been overcome by force or fear, we consider the record as a whole. Each case must be decided on its unique facts in arriving at this determination. Viewing J. C.'s testimony in the light most favorable to the prosecution, we conclude that a rational factfinder could have found beyond a reasonable doubt that she was overcome by force or fear. J. C. was alone in the house with the defendant, and before the defendant penetrated her vagina with his fingers, he touched her body in other places despite her requests that he stop. She testified that she asked him to stop when he was placing his fingers in her vagina and he did not. J. C. testified that she tried to keep defendant from touching her by trying to keep her legs together, "but they came apart." J. C. testified that she was afraid throughout the incident and that she felt powerless to stop what was happening. The jury believed that J. C. was overcome by force or fear. We find nothing in the record that so undermines J. C.'s credibility that we find it necessary to second-guess the jury.

The defendant urges the court to look to J. C.'s testimony that he did not force or threaten her to support his contention that she was not overcome by force or fear. Our task, however, is to view the evidence in the light most favorable to the prosecution

and determine whether a reasonable factfinder could conclude that J. C. was overcome by force or fear.

J. C. testified that she was afraid, that she did not consent to the sexual intercourse, that she felt powerless to do anything to stop the assault, that she told the defendant to stop, and that he nevertheless continued. Under the circumstances of this case, a reasonable factfinder could have found J. C. was overcome by fear. Although when asked on cross-examination whether the defendant forced or threatened her, J. C. testified that he did not, she also testified that she felt powerless to stop what was happening. She also testified that she told the defendant to stop what he was doing, but that he nevertheless continued.

Finally, the defendant cites a recent opinion of the Pennsylvania Supreme Court to support his contention that there was insufficient evidence of force or fear to sustain his rape conviction. In *Com. v. Berkowitz*, 537 Pa. 143, 641 A.2d 1161 (1994), the Pennsylvania Supreme Court concluded that the evidence was insufficient that a defendant engaged in nonconsensual sexual intercourse with another "by forcible compulsion." In *Berkowitz*, a female college student was assaulted in a dormitory room. Berkowitz sat on the floor beside the victim, lifted her shirt and bra, and fondled her breasts. After he unsuccessfully tried to put his penis in her mouth, they both stood, and he locked the door, pushed her onto the bed, removed her undergarments, and penetrated her vagina with his penis. As in the case before us, the victim repeatedly said "no" throughout the incident.

An opinion from another jurisdiction is not controlling authority in this court. Moreover, we find *Berkowitz* distinguishable in many important respects. We discuss those distinctions here because they afford an opportunity to clarify the law of this state as it pertains to the crime of rape.

The Pennsylvania legislature defined rape differently than did our legislature. The pertinent portions of the Pennsylvania statute under which Berkowitz was charged required the State to prove that the intercourse occurred "by forcible compulsion" or "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." *Berkowitz*, 537 Pa. at 147. The Penn-

sylvania legislature did not permit a rape conviction when a victim is overcome by fear, except to the extent that it is fear induced "by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." Fear in and of itself is inherently subjective. Unless otherwise limited in the statutory definition as it is in Pennsylvania, a finding that a particular victim is overcome by fear does not require proof that it is fear induced by threat of force that would prevent resistance by a reasonable person. What renders one person immobilized by fear may not frighten another at all. The reasonableness of a victim's claim that she was overcome by fear necessarily enters into the factfinder's determination about whether the victim is telling the truth. There is then an important difference between nonconsensual intercourse with a victim overcome by fear (Kansas) and sexual intercourse "by forcible compulsion" or "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution" (Pennsylvania).

Moreover, it appears that the Pennsylvania Supreme Court has determined that under Pennsylvania law, even when there is lack of consent, some psychological coercion or physical force in addition to the sexual intercourse is necessary to sustain a rape conviction. In *Berkowitz*, the court determined that the nonconsensual intercourse that occurred amounted only to "indecent assault," which the legislature defined as "indecent contact with another. . . without the consent of the other person." The court based its conclusion on the legislature's omission of the "forcible compulsion" requirement from the indecent assault statute and the omission of the explicit lack of consent requirement from the rape statute.

Although our sexual battery statute also omits the "force or fear" requirement, we do not believe that the nonconsensual intercourse that occurred here was merely sexual battery. In part, this determination arises from our conclusions about the nature of the force or fear required to establish the crime of rape. As we discussed above, fear is inherently subjective. Under Kansas law, when a victim testifies that she was overcome by fear, and her testimony is not "so incredible as to defy belief," *Cooper*, 252

Kan. at 347, there is sufficient evidence to present the ultimate determination to the factfinder. The reasonableness of a particular victim's fear may affect the jury's assessment of the victim's credibility in arriving at its verdict. The "force" required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. K.S.A. 21-3502 does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then endured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that the victim was overcome by force or fear to facilitate the sexual intercourse.

Viewed in a light most favorable to the prosecution, the evidence is sufficient that J. C. did not consent to the defendant's digital intercourse and that she was overcome by force or fear. Under these circumstances, we conclude that a rational factfinder could have concluded beyond a reasonable doubt that the sexual intercourse was nonconsensual and that the victim was overcome by force or fear.

### Duty to instruct on attempted rape

Under K.S.A. 21-3107, the court has a duty to instruct on lesser included offenses "of which the accused might be found guilty under the information or indictment and upon the evidence adduced." The defendant contends that he was entitled to an instruction on attempted rape because the evidence concerning whether penetration occurred was disputed. The defendant on appeal bases his contention on Dr. Bossmeyer's testimony that J. C. was a virgin without genital lacerations and Dr. Bossmeyer's "prior findings in real rape cases."

Penetration is an element of rape, but any penetration, however slight, is sufficient. To establish this element, actual penetration of the vagina or rupturing of the hymen is not required; penetration of the vulva or labia is sufficient. See *State v. Ragland*, 173 Kan. 265, 268, 246 P.2d 276 (1952).

J. C. testified that the defendant told her "he was going to take [her] pants off and stick his fingers inside of [her]." She consistently testified that he did stick his fingers in her vagina. The defendant denies that he touched J. C. at all, other than to give her a hug when he first arrived.

The defendant contends, however, that Dr. Bossmeyer's testimony is sufficient to put in issue whether penetration occurred. Dr. Bossmeyer's testimony is equivocal at best. He testified that he found no lacerations or bruising of the external genitalia and that J. C.'s hymen was intact. While he testified that he would expect to find lacerations in a virginal patient, he also testified that the presence of lacerations would "depend on the size of the object used." He found no bruising but he also testified that of all the rape examinations he had conducted in the last 10-15 years, he had found bruising in only one. Although J. C.'s hymen was intact, Dr. Bossmeyer also testified that, because of its elasticity, some women can have intercourse with no trauma to the hymen. Dr. Bossmeyer's opinion was that J. C. was "most likely" a virgin.

The duty of the trial court to instruct on the lesser included offense arises only when the evidence introduced at trial is such that the defendant might reasonably have been convicted of the lesser offense. *State v. Dixon*, 248 Kan. 776, 811 P.2d 1153 (1991). Given the nature of Dr. Bossmeyer's testimony and the slight penetration which is sufficient to support a conviction, Dr. Bossmeyer's testimony is not sufficient to give rise to a duty to instruct on attempted rape. Viewed as a whole, his testimony was inconclusive. Either penetration occurred (J. C.'s version) or no touching occurred (the defendant's version). Although Dr. Bossmeyer's testimony could support either of those conclusions, there is no evidence to support a finding that penetration was unsuccessfully attempted. See generally *State v. Crawford*, 247 Kan. 223, 795 P.2d 401 (1990) (no evidence presented to support conviction of attempted rape, failure to give instruction not error).

Moreover, the defense counsel's comments during the instruction conference indicate that the matter of lesser included offense instructions was discussed and that the defendant did not want any such additional instructions regarding any lesser offenses:

| | |
|---|---|
| Defense counsel: | "It is my impression that my clients are not going to request any additional instructions. If there were I would suggest that it might be sexual battery and battery. |
| The Court: | "Well, those aren't—those aren't included offenses. |
| Defense counsel: | "They are offenses that the State's case in chief, I believe, may have laid out facts that we've established those instead of the crime of—charged. Like I said I don't expect my clients to allow me to ask for them. . . ." |

. . . .

"I think it's been both sides' positions it's an all or none deal for quite a while pretty much. I'd just like an opportunity to confer with my client."

The defense counsel indicated he would confer with his client; there was a recess, and no further comment made about lesser included offense instructions.

The defendant also cites *State v. Hanks*, 236 Kan. 524, 529, 694 P.2d 407 (1985), in which the defendant who "inserted his gloved finger into [the victim's] vagina, and said that he ought to have intercourse with her" was found guilty of attempted rape. Thus, the defendant claims, he also is entitled to an instruction on attempted rape because J. C. similarly testified that the defendant put his finger in her vagina. In *Hanks*, however, the propriety of giving a lesser included instruction was not at issue. The jury in *Hanks* was instructed on attempted rape because that is what the defendant's conduct amounted to at the time. The crimes at issue in *Hanks* took place in 1981. At that time, K.S.A. 21-3501(1) (Ensley 1981) defined "sexual intercourse" for purposes of the rape statute as "any penetration of the female sex organ by the male sex organ." In 1983, the legislature amended 21-3501 to define sexual intercourse to mean "any penetration of the female sex organ by a finger, the male sex organ, or any object." L. 1983, ch. 109, § 1. Under the law at the time, Hanks' conduct did not rise to the level of rape, and an instruction on and conviction for attempted rape was appropriate. *Hanks* does not support the defendant's contention in this case, and we find that the trial court did not err in failing to instruct the jury on attempted rape.

The State's rebuttal evidence

The admission of rebuttal evidence is a matter left to the discretion of the trial court and is not reversible error unless the court abuses its discretion to the defendant's prejudice. *State v. Synoracki*, 253 Kan. 59, 853 P.2d 24 (1993). The defendant contends the trial court abused its discretion.

At issue is the testimony of Hope Collins. The defendant testified that Collins was one of his former students, that he bailed her out of jail, and that he "rented an apartment for her." He testified on direct that the money for the apartment came from one of Collins' friends or relatives. On cross-examination he testified unequivocally that he did not pay for the apartment.

The State called Collins to testify in rebuttal. The court allowed her testimony over the defendant's objection. She testified that the defendant rented an apartment in his and her name and that he paid for the apartment. That was, for all practical purposes, the extent of her testimony.

Apparently aware of the defendant's relationship with Collins and of other allegations about Collins about which no evidence was presented to the jury, the defense counsel moved before trial to exclude any evidence that the defendant had been seen in the company "of women known to be nude dancers." The trial court sustained the motion to exclude evidence about the defendant's association with an exotic dancer "unless something would come up that it would be relevant in rebuttal." Although there is no evidence in the record to that effect, the defendant's argument on appeal suggests that the exotic dancer at issue was Collins.

When the State sought to introduce Collins' testimony in rebuttal the defendant objected, claiming it was improper character evidence. The court ruled that it could reconsider the motion in limine in light of what transpired at trial and that there had been substantial evidence about the defendant's relationship with Collins that went to both his character, which the defendant had put in issue, and his credibility.

The defendant now contends that the court abused its discretion because admitting Collins' testimony was contrary to the initial ruling on the motion in limine and allowed the State to call

the witness to "impeach the defendant on an irrelevant collateral issue, where the highly prejudicial impact of calling a known stripper and nude dancer far outweighs any probative value, much less the value of impeaching on a collateral issue."

The defendant's argument is untenable. There was no evidence presented at trial that Collins was an exotic dancer. The defendant contends the jurors nevertheless were aware of Collins' occupation, referring the court to a post-trial affidavit of a juror stating that "[i]n my mind, Hope Collins was called as a witness to show the defendant had an association with a known stripper," to support his contention that Collins was "well known" as a nude dancer. The statement of one juror regarding his personal knowledge of this witness is not dispositive of the knowledge of the entire jury.

The defendant also complains, however, that because the court granted his motion in limine he did not inquire on voir dire about whether prospective jurors knew Collins. Thus, he had no way of knowing what the jurors knew of Collins' alleged occupation and reputation. The defendant has lost sight of how Collins' name ever came before the jury. It was the defendant who first testified about his relationship with Collins. He testified on direct about the relationships he maintained with his former students and how he helped them out even after they graduated. Collins was one such student.

The defendant cannot have it both ways. He sought to present to the jury the image that he is a helpful and caring teacher who cares for his students after they graduate. He sought to use Collins as an example of his kindness, but he sought to withhold her identity from the jury. He wanted to testify under oath that he did not pay for the apartment he rented in his and Collins' name and to preclude the State from presenting her testimony that he did pay for the apartment. Given the nature of this particular case, the defendant's fate hinged on whether the jury believed him or J. C. His credibility was a central issue in this case. Collins' testimony was properly admitted for the purpose of impeaching the defendant's credibility. The State presented no evidence about Collins' occupation. The trial court did not abuse its discretion.

The prosecutor's comments during closing argument

The defendant claims that certain comments made by the prosecutor during closing argument, to which trial counsel did not object, require reversal. It is well established that "reversible error cannot be predicated upon a complaint of misconduct of counsel in closing argument where no objection was lodged." *State v. Walker*, 244 Kan. 275, 280, 768 P.2d 290 (1989).

The defendant did object at trial to one of the State's comments about which he now complains. The prosecutor stated during her closing argument:

"[J. C.]'s background is one of adopted into a family raised by a very loving supporting family who has a limited education. Her high school graduation was out of a learning disabilities class. Is she employed? No. Are we talking about an adult versus an adult? I don't know. Chronologically yes, we are. Educational background, no, we are not. Experience, no, we're not."

Defense counsel objected, claiming the prosecutor was misstating the law.

The defendant contends on appeal that the court improperly overruled the objection because "the prosecutor is prohibited from appealing to the jury's sympathies or prejudices during argument because the prosecuting attorney is supposed to be a public officer whose responsibility is to oversee the proper administration of justice." The defendant also contends that because the court granted his motion in limine barring the State from introducing evidence that J. C. had a mental deficiency, the comment was improper.

Improper arguments made during closing arguments are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial. *State v. Hobbs*, 248 Kan. 342, Syl. ¶ 5, 807 P.2d 120 (1991). Such is not the case here. The State "is given much latitude in language and in manner of presentation as long as it is consistent with the facts and evidence." *State v. Hobbs*, 248 Kan. 342, Syl. ¶ 5. The prosecutor's comments were consistent with the facts and the evidence. J. C. attended a classroom for students with learning disabilities, she was adopted, and she was not employed. Both the victim's and the defendant's ages

were in evidence. The defendant testified about his own age, education, and work experience.

The defendant's claim that the comment was barred by the motion in limine is without merit. The trial court allowed the State to introduce evidence about J. C.'s background, including her family and where she went to school "to establish who the victim is." In ruling on the motion in limine, the court excluded reference to mental deficiency unless it was established by expert testimony. The prosecuting attorney did not, however, comment on J. C.'s mental deficiency. Rather, the prosecutor properly commented on the evidence regarding where J. C. went to school, the type of classes she attended, and other personal characteristics that made J. C. "who she is." The evidence supported the prosecutor's comment that J. C. and the defendant had different educational backgrounds and experiences. The comments were consistent with the evidence and did not violate the ruling on the motion in limine.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

ALLEGRUCCI, J., dissenting: I cannot accept the majority's conclusion that the evidence is sufficient for a rational factfinder to find beyond a reasonable doubt that J.C. was overcome by force and fear.

Unquestionably, J.C.'s testimony was conflicting as to whether she asked the defendant to stop or ever said "no" to the defendant. What she testified to on direct examination she contradicted on cross-examination. Nevertheless, I agree with the majority that the evidence, taken as a whole, was sufficient to support a finding that she did not consent to the sexual intercourse. However, pursuant to K.S.A. 21-3502, the State must also prove that J.C. was overcome by force or fear. Nonconsensual sexual intercourse is not rape unless it is done under one of the four circumstances set out in K.S.A. 21-3502.

As stated by the Pennsylvania Supreme Court in *Com. v. Berkowitz*, 537 Pa. 143, 149, 641 A.2d 1161 (1994):

"As to the complainant's testimony that she stated 'no' throughout the encounter with Appellee, we point out that, while such an allegation of fact would

be relevant to the issue of consent, it is not relevant to the issue of force. In *Commonwealth v. Mlinarich*, 518 Pa. 247, 542 A.2d 1335 (1988) (plurality opinion), this Court sustained the reversal of a defendant's conviction of rape where the alleged victim, a minor, repeatedly stated that she did not want to engage in sexual intercourse, but offered no physical resistance and was compelled to engage in sexual intercourse under threat of being recommitted to a juvenile detention center. The Opinion in Support of Affirmance acknowledged that physical force, a threat of force, or psychological coercion may be sufficient to support the element of 'forcible compulsion,' if found to be enough to 'prevent resistance by a person of reasonable resolution.' However, under the facts of *Mlinarich*, neither physical force, the threat of physical force, nor psychological coercion were found to have been proven, and this Court held that the conviction was properly reversed by the Superior Court. Accordingly, the ruling in *Mlinarich* implicitly dictates that where there is a lack of consent, but no showing of either physical force, a threat of physical force, or psychological coercion, the 'forcible compulsion' requirement under 18 Pa. C.S. § 3121 is not met."

I agree with the majority that "violent assaults and life-threatening actions are not necessary to sustain a 'force or fear' rape conviction." However, more than the unsupported conclusory statement of the victim is required.

J.C. testified on cross-examination:

"Q. And it's true that you felt some discomfort when this happened is what you've told us; is that correct?

"A. Yes.

"Q. And even then you did not tell Mr. Borthwick to stop, did you?

"A. I told him to think about it.

"Q. Right. But you did not tell him to stop, did you?

"A. No.

"Q. And you did not tell him no, did you?

"A. No.

"Q. As a matter of fact, I've asked you before and it's true, that Mr. Borthwick did not force you in any fashion, did he?

"A. No.

. . . .

"Q. At no time did Mr. Borthwick threaten you, did he?

"A. No.

"Q. At no time did you tell Mr. Borthwick you were afraid; isn't that correct?

"A. No.

"Q. That's not correct or—

"A. I said, 'Yes, it's correct,' but you don't tell anybody that you're afraid of 'um.

"Q. Okay. As a matter of fact, you've testified that there was nothing you did that would give Mr. Borthwick the indication that you were afraid; isn't that correct?

"A. That's correct.

. . . .

"Q. At no time did he apply force to you to make you do something out of force; isn't that correct?

"A. That's correct.

"Q. And you did nothing to show Mr. Borthwick or indicate to Mr. Borthwick that you were afraid of him; isn't that correct?

"A. I put my legs together."

On redirect examination, the following questions were asked by the State's prosecutor and answered by J.C.:

"Q. Okay. But you never used the word no; is that correct?

"A. That's correct.

"Q. You stated that the defendant didn't force you in any way to do—for him to do these things to you.

"A. Yes.

"Q. Okay. You also said though that you held your legs together. What was the reason that you tried to hold your legs together?

"A. 'Cause he was trying to put his fingers inside of me.

"Q. And what did you think holding or trying to hold your legs together would do?

"A. Try and stop him.

. . . .

"A. I was afraid of him, yes.

"Q. What was it that you were afraid of?

"A. Well, he didn't—he didn't put his—he didn't put all of his sentences together and there was pieces and that wasn't exactly put together in my mind.

"Q. Okay. How did that frighten you?

"A. Well, he didn't tell me the truth and I didn't think it was fair of him not to tell me the truth.

"Q. You stated in your cross-examination testimony that you don't tell anyone you're afraid of them. Can you explain that?

"A. Well, if somebody's bigger than you are and you're smaller, which I am, you don't tell anybody that you're afraid of them 'cause they might hurt you."

Finally, on recross-examination, J.C. testified:

"Q. Okay. When Mr. Borthwick, according to your testimony, was putting his fingers inside you, he wasn't pinning you down, was he?

"A. No.

"Q. He didn't have his body weight on top of you, did he?

"A. No.

"Q. No, he had nothing to force you at that point, had he?

"A. No.

"Q. Okay. Furthermore, Mr. Borthwick wasn't threatening you in any fashion, was he?

"A. No.

"Q. Nothing he was doing caused you—let me rephrase that. He did not say something to you that caused you to be afraid, did he?

"A. No.

"Q. He didn't say, 'I'm going to kill you if you tell anybody about this,' correct?

"A. No.

"Q. He didn't say, 'You'll go to jail because of this,' correct?

"A. No.

"Q. The only thing Mr. Borthwick ever said to you was, according to your testimony, is that he would be in trouble, correct?

"A. Yes.

"Q. Now, he didn't say anything to you to cause you to be afraid of him, did he?

"A. No.

"Q. The only thing that you're upset about or you're afraid of is the fact that it might hurt, correct?

"A. Yes.

"Q. And that your mother would be upset, correct?

"A. Yes, there's no doubt in my mind.

. . . .

"Q. But Mr. Borthwick didn't threaten you, did he?

"A. No.

"Q. And Mr. Borthwick did not apply force to you, did he?

"A. No.

"Q. So it was nothing that Mr. Borthwick did by what he said that caused you fear; isn't that right?

"A. I was afraid of him. You don't say it out loud. You can think it. You don't tell anybody that you're afraid of him."

The majority finds this conclusory testimony of J.C. sufficient for a reasonable factfinder to find beyond a reasonable doubt that J.C. was overcome by force or fear. The majority states:

"J.C. was alone in the house with the defendant, and before the defendant penetrated her vagina with his fingers, he touched her body in other places despite her requests that he stop. . . . [S]he tried to keep defendant from touching her by trying to keep her legs together, 'but they came apart.' J.C. testified that she was afraid throughout the incident and that she felt powerless to stop what was happening. . . .

. . . .

"J.C. testified that she was afraid, that she did not consent to the sexual intercourse, that she felt powerless to do anything to stop the assault, that she told the defendant to stop, and that he nevertheless continued."

The fact that J.C. tried to keep her legs together is not evidence that the defendant used force. J.C. is a 21-year-old with cerebral palsy. She testified she could not walk or stand unaided. Obviously, she has limited use of, or strength in, her legs. She did not testify that the defendant forced her legs apart. The fact that J.C. tried to keep her legs together tends to support that she did not consent but not that force was used. This is particularly true in light of her testimony that the defendant did nothing to force her to have sexual intercourse. It should be noted that the State did not charge the defendant under K.S.A. 21-3502(b), which proscribes nonconsensual sexual intercourse when the victim is physically powerless. The State makes no allegation or argument that J.C. was rendered powerless due to her physical condition.

The majority attempts, in my view unsuccessfully, to distinguish *Berkowitz* from the present case, stating:

"Fear in and of itself is inherently subjective. Unless otherwise limited in the statutory definition as it is in Pennsylvania, a finding that a particular victim is overcome by fear does not require proof that it is fear induced by threat of force that would prevent resistance by a reasonable person. What renders one person immobilized by fear may not frighten another at all. The reasonableness of a victim's claim that she was overcome by fear necessarily enters into the factfinder's determination about whether the victim is telling the truth."

In the recent case of *People v. Iniguez*, 7 Cal. 4th 847, 30 Cal. Rptr. 2d 258, 872 P.2d 1183 (1994), the California Supreme Court reversed the Court of Appeal's decision which vacated the defendant's rape conviction because the evidence of force or fear was insufficient to support the conviction. In finding the evidence of fear sufficient to support the verdict, the court noted that the relevant rape statute had been amended to eliminate the resistance requirement and the requirement that threat of immediate bodily harm be accompanied by an apparent power to inflict the harm. The court, however, noted:

"In [*People v.*] *Barnes* [42 Cal. 3d 284], we then addressed the question of the role of force or fear of immediate and unlawful bodily injury in the absence of a resistance requirement. We stated that '[a]lthough resistance is no longer

the touchstone of the element of force, the reviewing court still looks to the circumstances of the case, including the presence of verbal or nonverbal threats, or the kind of force that might reasonably induce fear in the mind of the victim, to ascertain sufficiency of the evidence of a conviction under section 261, subdivision (2).' (*Barnes, supra,* 42 Cal. 3d at p. 304.) 'Additionally, the complainant's conduct must be measured against the degree of force manifested or in light of whether her fears were genuine and reasonably grounded.' (*Ibid.*) 'In some circumstances, even a complainant's unreasonable fear of immediate and unlawful bodily injury may suffice to sustain a conviction under section 261, subdivision (2), if the accused knowingly takes advantage of that fear in order to accomplish sexual intercourse.' " 7 Cal. 4th at 856.

The court further stated:

"Thus, the element of fear of immediate and unlawful bodily injury has two components, one subjective and one objective. The subjective component asks whether a victim genuinely entertained a fear of immediate and unlawful bodily injury sufficient to induce her to submit to sexual intercourse against her will. In order to satisfy this component, the extent or seriousness of the injury feared is immaterial. [Citations omitted.]

"In addition, the prosecution must satisfy the objective component, which asks whether the victim's fear was reasonable under the circumstances, or, if unreasonable, whether the perpetrator knew of the victim's subjective fear and took advantage of it." 7 Cal. 4th at 856-57.

The court then applied these principles to the evidence and concluded that there was substantial evidence that the victim's fear of immediate and unlawful bodily injury was reasonable. The court relied on the following evidence:

"Defendant, who weighed twice as much as [the victim], accosted her while she slept in the home of a close friend, thus violating the victim's enhanced level of security and privacy. (*Cf. People v. Jackson* (1992) 6 Cal. App. 4th 1185, 1190 ['A person inside a private residence, whether it be their own or that of an acquaintance, feels a sense of privacy and security not felt when outside or in a semipublic structure . . . providing the (attacker) with the advantages of shock and surprise which may incapacitate the victim(s).'])

"Defendant, who was naked, then removed [the victim's] pants, fondled her buttocks, and inserted his penis into her vagina for approximately one minute, without warning, without her consent, and without a reasonable belief of consent. Any man or woman awakening to find him or herself in this situation could reasonably react with fear of immediate and unlawful bodily injury. Sudden, unconsented-to groping, disrobing, and ensuing sexual intercourse while one appears to lie sleeping is an appalling and intolerable invasion of one's personal autonomy that, in and of itself, would reasonably cause one to react with fear." 7 Cal. 4th at 858.

" '[S]he knew that the man had been drinking. She hadn't met him before; he was a complete stranger to her. When she realized what was going on, she said she panicked, she froze. She was afraid that if she said or did anything, his reaction could be of a violent nature.' " 7 Cal. 4th at 852 (quoting trial testimony).

"In addition, immediately after the attack, [the victim] was so distraught her friend Pam could barely understand her. [The victim] hid in the bushes outside the house waiting for Pam to pick her up because she was terrified defendant would find her; she subsequently asked Pam if the word 'rape' was written on her forehead, and had to be dissuaded from bathing prior to going to the hospital. [Citation omitted.]" 7 Cal. 4th at 857-58.

This evidence is in stark contrast to the evidence in the present case, particularly as to whether J.C. was overcome by fear.

Here, the majority totally ignores the objective component to the element of fear. What rendered J.C. to be immobilized by fear? That the defendant "didn't put all of his sentences together" and "he didn't tell . . . the truth." J.C. testified the defendant never threatened, coerced, or used force. How can a "reasonable factfinder" find her fear to be "reasonable"? Although J.C. testified she was afraid, her fear was not of what would happen to her if she did not submit to the defendant. She testified on cross-examination that "the only thing" she was afraid of was that "it might hurt," "that [her] mother would be upset," and what defendant's wife would think.

A majority of this court, citing *State v. Cooper*, 252 Kan. 340, 347, 845 P.2d 631 (1993), holds: "Under Kansas law, when a victim testifies that she was overcome by fear, and her testimony is not 'so incredible as to defy belief,' there is sufficient evidence to present the ultimate determination to the factfinder." In *Cooper*, we merely noted this rule was of a common-law origin and had not been modified. It had no application in *Cooper* since we found the victim's testimony was corroborated by "physical evidence, witness testimony, and by Cooper's own statements." 252 Kan. at 347. Nevertheless, it does provide an example of a victim's testimony which would alone sustain a rape conviction. The victim testified that Cooper beat her, threatened her, held her against her will, sat on her, tied her up, and choked her. I agree that the testimony of a victim alone can be sufficient to support a rape

conviction, provided, however, that the testimony recites a factual basis to reasonably conclude that the victim was overcome by fear. Although the majority fails to define fear in the context of K.S.A. 21-3502, it does essentially redefine rape as nonconsensual sexual intercourse. If nonconsensual sexual intercourse, other than under the circumstances set out in K.S.A. 21-3502, is to be made a felony offense, it must be done by the legislature and not this court.

Simply stated, the majority holds that the State need not prove beyond a reasonable doubt that the victim is overcome by force or fear but, rather, a conclusory statement from the victim to that effect is sufficient. Absent the legislature's amending K.S.A. 21-3502, I cannot accept that to be the law in this state. I agree with Judge Kay Royse that the evidence is not sufficient to establish that J.C. was overcome by force or fear.

ABBOTT, J., joins the foregoing dissenting opinion.